## Hess *v.* Philadelphia Transportation Company, Appellant.

Argued December 5, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON and JONES, JJ.

*Philip Price,* with him *Bernard J. O'Connell,* for appellant.

*Daniel G. Murphy,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 5, 1948:

Plaintiff, William H. Hess, while driving to work on October 3, 1944 stopped at 29th Street and Girard Avenue, Philadelphia for a traffic light. While the car was halted, defendant's overhead loose trolley wire, carrying a current of 600 volts, came in contact with plaintiff's car. As a result, plaintiff, according to his tes-

timony, "was lifted up out of the seat of the car" and "hit the steering wheel". "I just sensed something was wrong, the car felt hot. . . . I seen a lot of blue around, blinding blue, and I couldn't see parts of the car for about a second while I was held up in the air. Then I could hardly breathe. When I sat down I realized there was something wrong with the car, it was hot, and I took my coat part like this somehow (hold the tail of the coat in hand), and I undone the door, and I stepped out, and when I stepped out I froze like a statue . . . it felt like something went up my back and hit me in the top of the head; that's all I can tell you." The electric shock thus received caused plaintiff to suffer contusions, abrasions, psychoneurosis and impotence. For these injuries plaintiff sought to recover damages in a suit against defendant in which the latter was charged with negligence in its control and management of the trolley wire. A verdict for $5,000. was recovered by plaintiff and final judgment was entered thereon. Defendant filed motions for judgment n. o. v. and a new trial. Both motions were denied and this appeal followed.

Immediately after the occurence described and while still in a dazed condition, Hess entered a restaurant and phoned the police. He afterwards drove to the Bendix plant where he was employed as a machinist. He became ill shortly after his arrival and went to the plant dispensary. While there he fainted. After regaining consciousness and assuring the attending personnel that he felt physically capable, he drove home and went to bed. He remained at home under the care of his family physician, Dr. Bernstein, for three days.

Upon returning to work, Hess discovered that his mental and physical condition prevented him from satisfactorily discharging his regular duties. He thereupon transferred to the shipping room at a reduction in wages. Because he "couldn't stand the noises in the shop from the time that it [the accident] happened", he resigned

and sought employment elsewhere. Plaintiff testified: "I just wanted always to run out through a window or through a door when any noises was around me. I couldn't stand the noise and I can't stand it to this day.' The neurosis which plaintiff developed as a result of the accident, forced him to undertake intermittent and irregular employment at a gradual but marked impairment in earnings. Plaintiff complained of constant "headaches" and stated that he couldn't reach over and pick things up off the floor without getting a headache. He experienced "blind spots" and gave up his work because eventually the noises "got on his nerves".

Dr. Bernstein, plaintiff's family physician, testified that he found no physical evidence of injury; that plaintiff had no organic injuries but apparently was suffering from a mental neurosis which made him believe many things were wrong with him. Dr. Bernstein referred Hess to a specialist for further diagnosis. Dr. Drayton, a neuropsychiatrist, examined plaintiff on December 10, 1945 and likewise discovered no signs of physical injury. He diagnosed plaintiff's condition as "intense psychoneurosis". Dr. Drayton conceded the genuineness of Hess' mental state and attributed it to a "terrible fright" emerging probably from the realization that "he was lucky to be alive". The reaction, in his opinion, was "real and genuine". He was uncertain as to whether or not plaintiff would recover from his condition but suggested psychoanalysis or narcophypnosis as a possible treatment.

The reality of plaintiff's injuries was disputed by the expert testimony of defense witnesses, C. T. Pierce, electrical engineer for Westinghouse Electric Corp., and C. D. Fawcett, Professor of Electrical Engineering at the University of Pennsylvania and a consulting engineer. They, in attempting to controvert plaintiff's claims, stated it was scientifcally impossible for an accident such as that described by plaintiff to occur, and that a person inside an automobile is insulated against shock from

lightning or any other electrical manifestation since the electrical current in such instances will encircle the car through its outside metal and will pass into the ground. The person in the car will suffer no injury. A photograph of an actual experiment conducted by the Westinghouse laboratories was produced at the trial to prove the invulnerability of a car's occupant to an electrical shock. The experiment consisted of pouring three million volts into an automobile from a distance of 10 or 12 feet, with electricity passing through the outside metal of the car and off a wheel rim to the ground, leaving unharmed a man sitting at the wheel of the car. The engineers estimated that three or four hundred thousand volts had passed through the car and stated that there was no "difference of potential" from which a shock could result, and that the situation was the same as to plaintiff and his car where far less voltage was involved.

Whether or not plaintiff suffered the shock alleged was a matter for the jury's consideration. Since the scientific impossibility of an occurrence such as that described by the plaintiff was not incontrovertibly established by defendant's expert testimony and since the circumstances and atmospheric conditions attending the experiment conducted were not identical to those attending plaintiff's experience, the court was precluded from passing on this question as a matter of law. The jury by its verdict decided that plaintiff suffered a physical impact, that is an electric shock, which would justify damages for the mental distress or fright resulting therefrom.

That there can be no recovery for injuries resulting from fright, or a nervous shock, unaccompanied by physical injuries is the established law in this state. See *Koplin v. Louis K. Liggett Co.*, 322 Pa. 333, 185 A. 744; *Howarth v. Adams Express Co.*, 269 Pa. 280, 112 A. 536; *Ewing v. Pittsburgh, Cincinnati & St. Louis Ry. Co.*, 147 Pa. 40, 23 A. 340; *Huston v. Freemansburg Boro*, 212 Pa. 548, 61 A. 1022. In the latter case Chief Justice

MITCHELL characterized "mere mental disturbance" as being too "intangible, so untrustworthy, so illusory and so speculative" to be a cause of action. However, in applying the above rule, a "nervous shock" must be distinguished from an "electric shock". An electric shock is "a direct physical and personal assault", and any fright or nervous disorders arising from such an "assault" negligently caused is compensable in damages. See *Buckbee v. Third Ave. R. R. Co.,* 64 App. Div. 360, 72 N. Y. S. 217. In *North German Lloyd Steamship Co. v. Wood,* 18 Pa. Superior Ct. 488, the Superior Court said: "The nervous system is a part of the physical organization, and this affidavit sufficiently alleges a physical injury. Mental suffering, as distinct from bodily pain, can be considered in an action for damages for injury to the person, when such suffering is attendant upon and results from a physical injury: Wilcox v. Richmond & Danville Ry. Co., 52 Federal Reporter, 264."

The Supreme Court of New Jersey in *Consolidated Traction Co. v. Lambertson,* 59 N. J. L. 297, 36 A. 100, held that where there is actual physical injury, damages resulting from the incidental fright may be recovered.

In view of the fact that at the time of the injuries complained of the defendant's wire was on the rear bumper of plaintiff's car and that during part of the period plaintiff had one foot on the ground and the other in the car, and in view of the further fact that on the morning of the occurrence it had been raining and therefore presumably the ground was damp, the jury was justified in concluding that plaintiff's claim that he had received an electric shock was true. We agree with what the court below said in denying a motion for a new trial, to wit: "the evidence in this case was sufficient for the jury to find enough of a physical injury to permit recovery also for the injury to plaintiff's nervous system resulting from the fright. Assuming, as we must, that plaintiff received an electrical shock originating from the current flowing through defendant's trolley wire (it

was not questioned that the jury's verdict established defendant's negligence in the falling of the wire), the experiencing of such a shock must be considered a substantial physical injury rather than a mere technical battery, even though no externally visible marks were found. . . . But here, taking into consideration the heavy voltage in a trolley wire (600 volts), and plaintiff's description of his reactions at the time of the shock, it must be considered a substantial physical injury, sufficient to carry with it the consequences of the fright that also brought psychic injury to him."

The judgment is affirmed.